Heath A. WILLIAMS, Plaintiff,

v.

Larry C. FEDOR, Philip Checchia, James Sartori, Kevin Kelly, Borough of Stroudsburg, and County of Monroe.

No. 3:97–CV–0033.

United States District Court, M.D. Pennsylvania.

Aug. 4, 1999.

James A. Swetz, Stroudsburg, PA, for plaintiff.

Calvin R. Koons, Fedor, Checchia & Sartori, Harrisburg, PA, Sean P. McDonough, Kelly & Borough, Scranton, PA, Gerald J. Geiger, County of Monroe, Stroudsburg, PA, for defendants.

## *MEMORANDUM*

VANASKIE, District Judge.

On January 8, 1997, plaintiff Heath Williams filed the instant action against Pennsylvania State Police Officers Larry Fedor and James Sartori, Philip Checchia (an investigator for the State's Attorney General's Office), Kevin Kelly (the Police Chief for the Borough of Stroudsburg), the Borough of Stroudsburg and Monroe County. (Dkt. Entry 1 at 1–2.) Williams' suit is premised upon defendants' decision to prosecute him for perjury and other charges based upon the alleged inconsistency between his statements in an "off-the-record" interview in 1991 and his grand jury testimony in 1995, even though he had been promised that he would not be prosecuted for anything he said during the 1991 interview. Williams has asserted claims under 42 U.S.C. § 1983 and Pennsylvania common law for malicious prosecution, false arrest and abuse of process. He also asserts that the prosecution violated his Fifth Amendment privilege against self-incrimination and his First Amendment right to seek redress for alleged wrongs purportedly committed by state and local officials.

Pending before the court are motions for summary judgment filed on behalf of Monroe County (Dkt. Entry 35), Kelly and the Borough of Stroudsburg (collectively referred to as the "Borough Defendants") (Dkt. Entry 39), and Checchia, Fedor and Sartori (collectively referred to as the "State Defendants") (Dkt. Entry 43).

With respect to Monroe County, Williams has failed to present sufficient evidence to support a conclusion that the prosecutorial decisions of District Attorney James Gregor should be attributed to the County; nor has he presented evidence sufficient to support a reasonable inference that his rights were violated as a result of a failure to train or supervise attributable to the County. As to the Borough Defendants, Williams has failed to show that Chief Kelly had any culpable involvement in his prosecution. Finally, the State Defendants are entitled to qualified immunity on Williams' malicious prosecution and Fifth Amendment claims, and Williams has not presented sufficient evidence to warrant a trial on his remaining claims. Accordingly, judgment will be entered in favor of all the defendants.

## I. BACKGROUND

From plaintiff's perspective, this case is part of the John Pansy saga. In the late 1980's and early 1990's, Pansy had been Chief of the Borough of Stroudsburg (the Borough) Police Department. In 1991, he was prosecuted by the Pennsylvania Attorney General's Office for alleged improper handling of parking meter money. Pansy was acquitted of these charges and brought an action against members of the Attorney General's Office. This litigation ended with summary judgment being entered in favor of the defendants, a result affirmed by the Third Circuit. *Pansy v. Preate*, 870 F.Supp. 612 (M.D.Pa.1994), *aff'd mem.*, 61 F.3d 896 (3d Cir.1995). (Aff. of James A. Swetz, Esq., Exhibits 1 and 2.)

Pansy had also brought an action against the Borough. As part of the settlement of this lawsuit, Pansy was employed by the Borough as a Detective/Lieutenant. In this capacity, Pansy was subordinate to defendant Kevin Kelly, who was appointed Chief of the Borough Police Department in 1992.

Pansy's relationship with Kelly was not always harmonious. In the fall of 1994, Kelly participated in a meeting with Fedor and Sartori, who were Pennsylvania State Police Officers, Checchia, an investigator for the Attorney General's Office, Monroe County Assistant District Attorney Andrew Worthington and Monroe County District Attorney James Gregor. During this meeting there was a discussion of potential criminal acts by Pansy and Kenneth Nevil, also a Borough Police officer. Checchia and Sartori indicated that Williams could implicate Nevil in criminal conduct, and Nevil in turn could implicate Pansy. (Checchia Dep. at 33–34; Sartori Dep. at 29–32.)

The belief that Williams would implicate Nevil was based upon statements purportedly made by Williams in 1991 when he was interviewed by state officials. Williams had been hired by the Borough Police Department in April or May of 1990. (Monroe Cty's Stmt. of Facts, at ¶ 2.)[1] Between 1989 and 1991, the Pennsylvania State Police, in coordination with the Pennsylvania Attorney General's Office, investigated the Stroudsburg Police Department. (Monroe Cty's Stmt. of Facts (Dkt. Entry 37) at ¶ 22; Williams' Answer to Monroe County's Stmt. of Material Facts (Dkt. Entry 53) at ¶ 22.) Williams was interviewed on March 27, 1991 and April 2, 1991 by the State Police in the presence of his attorney, William Watkins, and defendant Checchia of the Office of the Attorney General. (Monroe Cty's Stmt. of Facts at ¶ 23; Williams Response to Monroe Cty's Stmt. of Facts at ¶ 23.)[2] "The purpose of the meetings was to show Williams arrest warrant affi-

---

[1]. Citation will be made to the pertinent paragraph of a movant's statement of material facts where the plaintiff has admitted that paragraph. Otherwise, citation will be made to both the movant's statement and the response thereto, or to the appropriate part of the underlying record.

[2]. Checchia, Williams, Watkins and State Trooper Donald Kresge were present at the March 27, 1991 and April 2, 1991 meetings. (*Id.* at ¶ 25.) At the time of the interviews, there were charges pending against Williams relating to unsworn false statements.

davits that had been prepared and filed by Detective Kenneth Nevil in criminal cases that he had prosecuted and to question Williams as to whether the affidavits contained false statements made by Nevil." (Monroe Cty's Stmt. of Facts at ¶ 24.)[3] Williams answered the investigators' questions after receiving a written promise from Chief Deputy Attorney General John J. Burfete, Jr. that "no statements made by or other information provided by [Williams] will be used against [him] in any criminal case." (Ex. "D" to Monroe Cty's Stmt. of Facts.) The interview of Williams was described as an "off-the-record proffer." (*Id.*) During the course of the interview, Williams purportedly provided information that implicated Nevil in making false statements in arrest warrant affidavits. (Ex. "B" and "C" to Monroe Cty's Stmt. of Facts.) The interview was not recorded auraly or stenographically, and the only record of it are "General Investigation Reports" prepared by State Trooper Kresge. (*Id.*) Significantly, Williams was not asked to verify the contents of Trooper Kresge's reports in 1991.[4]

3. Williams contends that the meetings also concerned the policies and procedures of the Stroudsburg Police Department. (Williams Answer to Monroe Cty's Stmt. of Facts at ¶ 24.)

4. Williams was asked at the time to cooperate with the investigation by wearing a body recorder. (Checchia, et al. Stmt. of Facts, ¶ 12.) After he declined he was arrested on charges of giving unsworn false statements to authorities, the charges that had been pending at the time of his interview. (*Id.*, ¶ 13.) These charges were resolved through Williams' placement in the Accelerated Rehabilitative Disposition ("ARD") program, with the charges expunged by order entered on March 12, 1992. (*Id.*, ¶ 14.) In 1994, Williams retained counsel due to concerns that the expungement order had not been implemented. (Williams' Response to Checchia, et al. Stmt. of Facts, ¶ 15.) Williams, however, did not pursue any legal action and there is no evidence that any of the defendants were aware of problems with the implementation of the expungement order.

5. The decision to empanel a grand jury was Gregor's. (Monroe Cty's Stmt. of Facts, ¶ 5.)

In 1995, District Attorney Gregor convened an investigative grand jury. (Monroe Cty. Stmt. of Facts, ¶ 32.)[5] The purpose of the grand jury was to investigate the Stroudsburg Police department and, in particular, Officers Nevil and Pansy. (Gregor Dep. at 20.)[6] Gregor called Williams to testify before the grand jury because he was told by Checchia and Sartori that Williams could provide testimony against Nevil and Pansy. (Monroe Cty. Stmt of Facts, ¶ 36.)[7]

Before Williams testified, Gregor and Watkins (Williams' lawyer) met in chambers with Monroe County President Judge Ronald E. Vican. During that meeting, President Judge Vican was informed of the 1991 letter from Chief Deputy Attorney General Burfete. The purpose of the meeting was not to obtain a judicial grant of immunity from prosecution under 42 Pa.C.S. § 5947. (Gregor Dep. at 27–29.) Instead, the purpose of the meeting was to have D.A. Gregor confirm that he was bound by Burfete's letter agreement. (Gregor Dep. at 29.) By letter dated April 5, 1995 from Gregor to Williams' lawyer,

6. Williams contends that the purpose of the grand jury was to investigate Pansy as a result of Kelly's complaints to Gregor and Assistant District Attorney Worthington concerning the unworkability of Pansy's employment contract with the Borough and Pansy's alleged fabrication of an incident that occurred between him and Borough Police Lieutenant Rundle. (Williams' *Response to Monroe Cty's Stmt. of Facts*, ¶ 33.) "The theory of the investigation and prosecution was a 'domino theory.' The target of the investigation was John Pansy. The theory of the investigation was to pressure Williams whose testimony would implement [sic] Kenneth Nevil who in turn would incriminate John A. Pansy." (Williams' Response to D. Kelly's Stmt. of Facts, Dkt. Entry 51, at ¶ 1.)

7. Williams alleges that he was an *integral part* of the defendants' "domino theory," in which defendants hoped to get Williams to incriminate Nevil and thereby gain the leverage necessary to get Nevil to incriminate Pansy in an attempt to eventually force Pansy out of Borough employment. (Williams' Response to Monroe Cty's Stmt. of Facts, ¶ 36.)

Gregor confirmed that the District Attorney's Office would be bound by Burfete's promise.

Williams testified before the grand jury on two occasions: March 15, 1995 and April 5, 1995. (Monroe Cty. Stmt. of Facts, ¶ 46.) On March 15, 1995, Williams testified to the grand jury that he could not recall the specifics of his interviews with Checchia and Kresge in 1991. (Williams Grand Jury Testimony at 50–51, Monroe Cty's Stmt. of Facts, Exhibit "G.") Gregor called Williams as a witness before the grand jury for the second time on April 5, 1995, for the purposes of determining whether he could refresh Williams' recollection regarding what he had previously told the state police. (Monroe Cty's Stmt. of Facts, ¶ 57.) Williams continued to claim that he could not recall his earlier statements. He also insisted that Kresge's report was inaccurate. (Monroe Cty's Stmt. of Facts, ¶ 58; Williams Response to Monroe Cty's Stmt. of Facts, ¶ 58.) Gregor continued to question Williams regarding the 1991 meetings, but Williams continued to deny any recollection of accusing Nevil of making false statements in criminal affidavits. (Monroe Cty's Stmt. of Facts, ¶ 59.) [8]

Gregor and his staff, with the assistance of Troopers Kresge and Fedor, prepared a presentment that was handed down by the grand jury. (Id. at ¶ 64.) The presentment recommended that the District Attorney prosecute Williams for false swearing, in violation of 18 Pa.C.S.A. § 4903, false reports, in violation of 18 Pa.C.S.A. § 4906, perjury, in violation of 18 Pa.C.S.A. § 4902, and obstruction of justice, in violation of 18 Pa.C.S.A. § 5101. [9] The presentment essentially accused Williams of lying during his 1991 interview and/or lying during his 1995 grand jury testimony.

On the basis of the presentment, a Criminal Complaint and Probable Cause Affidavit was signed by defendants Fedor and Checchia on August 30, 1995. [10] (Checchia et al. Stmt. of Fact, ¶ 24.) District Attorney Gregor approved the Criminal Complaint and Probable Cause Affidavit. (Id.) The Criminal Complaint and Probable Cause Affidavit incorporated by reference the grand jury presentment against Williams. The criminal complaint contained 36 counts, all of which derived in some manner from the 1991 interview and Williams' grand jury testimony. Neither the criminal complaint nor the probable cause affidavits mentioned Deputy Attorney General Burfete's 1991 letter pursuant to which Williams made the "off the record proffer."

It is undisputed that Williams was not arrested on the charges. It is also undisputed, however, that legal process was authorized by a district justice, that Williams was released on his own recognizance, that Williams was required to submit to pro-

8. Williams gave the following testimony before the grand jury:
Q. Do you recall reviewing each of the documents in each of the cases that I just read to you and pointing out various inconsistencies between what happened and what Detective Nevil wrote on the affidavits?
A. I spoke with him about the procedures about the undercover operations. Now, specifics from that, I can't recall that, you know, positively, sir.
Q. If I were to show you the documents and point to the areas which you indicated to the agents that this was not accurate, would that refresh your recollection?
A. I've looked at the documents with the agents already, sir, and I've told them what I have recalled and what I can't recall. . . .
Q. Are you telling us today that certain of the details that you have said—that you can't remember what details you said were not accurate according to your recollection of the events?
A. Sitting here now, right now, yes sir, that's true.
(Williams Grand Jury testimony, Monroe Cty. Stmt. of Facts, Exhibit "J" at 146–147.)

9. The grand jury presentment is included as part of Exhibit 6 to Checchia's deposition transcript.

10. See Exhibit 6 to Checchia's deposition transcript.

cessing by the State Police, and that he was obligated to appear for a preliminary hearing on October 30, 1995, for arraignment on May 6, 1996, and for a pretrial evidentiary hearing. Following the preliminary hearing on October 30, 1995, the District Justice bound over for court action all charges filed against Williams. (Williams Aff. (Dkt. Entry 56) at ¶ 6.) According to Williams, "[t]he District Justice indicated that the issues concerning [the] non-persecution [sic] agreement [i.e., Deputy Attorney General Burfete's 1991 letter] would be heard by the Court of Common Pleas." (Id.)

District Attorney Gregor lost his re-election bid in November of 1995. The new District Attorney, Mark Pazuhanich, had previously represented Williams. (Monroe Cty. Stmt. of Facts, ¶ 68.) Consequently, a special prosecutor was appointed to take over the prosecution of Williams. The Monroe County District Attorney's office was not involved in the prosecution of Williams after Gregor left office on December 31, 1995. (Monroe Cty's Stmt. of Facts at 10.)

Williams, through counsel, filed an omnibus pretrial motion asking that the charges against him be dismissed. (Id.) On June 24, 1996, the Hon. Peter O'Brien of the Court of Common Pleas of Monroe County dismissed the charges against Williams, holding that Williams' agreement with Deputy Attorney General Burfete constituted a non-prosecution agreement. (Id.; Judge O'Brien Opinion, Monroe Cty's Stmt. of Facts, Exhibit "L.") In his Opinion, Judge O'Brien described the breach of the non-prosecution agreement as a "blatant abuse of prosecutorial authority...."

The special prosecutor appealed the dismissal of the charges to the Pennsylvania Superior Court. (Monroe Cty. Stmt. of Facts, ¶ 73.) The appeal was dismissed because the special prosecutor failed to file a supporting brief. (Id., ¶ 74.) It is undisputed that the Monroe County District Attorney's Office did not participate in the appeal and was not responsible for the dismissal of the appeal. (Id., ¶ 75.) [11]

This civil rights action followed the conclusion of the criminal proceedings against Williams. There are three classes of defendants: (1) Monroe County, which is being sued on the basis of action and inaction of District Attorney Gregor and his staff; (2) Checchia and State Troopers Fedor and Sartori who are being sued for their alleged involvement in the prosecution of Williams notwithstanding the existence of the non-prosecution agreement; and (3) Borough Police Chief Kelly and the Borough itself, who essentially are being sued because of Chief Kelly's alleged involvement in a conspiracy to remove Pansy from the Borough Police Force by pressuring Williams to implicate Nevil who would then be pressured to implicate Pansy. Because there are distinct legal issues as to each category of defendants, the summary judgment motions of each category will be addressed separately.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 197 (3d Cir.), *cert. denied*, 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503

---

11. Pansy and Nevil were also prosecuted in 1995. The charges against Nevil were dismissed. Nevil asserts that his promise not to sue anyone was a condition of the dismissal. (Nevil Dep. at 5.) Pansy pled guilty to a misdemeanor, was fined $2,500 and resigned from employment with the Borough.

(1994). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

Initially, the moving party must show the absence of a genuine issue concerning any material fact. *Celotex Corp. v. Catrett,* 477 U.S. at 322, 329, 106 S.Ct. 2548 (1986). All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988); *Continental Ins. Co. v. Bodie,* 682 F.2d 436 (3d Cir.1982). Once the moving party has satisfied its burden, the nonmoving party "must present affirmative evidence to defeat a properly supported motion for summary judgment." *Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505. The affirmative evidence must consist of verified or documented materials. Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials. *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990). Rule 56 requires the entry of summary judgment, after adequate time for discovery, where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

**B. Williams' Claims Against Monroe County**

Williams seeks to impose liability on Monroe County on two separate theories. First, he asserts that in Pennsylvania "a district attorney incurs liability for the County by making prosecutorial decisions." (Brf. in Opp. to Monroe Cty's S.J. Mot. (Dkt. Entry 50) at 14.) He thus claims that "by attribution," a D.A.'s "decision would be considered an official decision of the government unit...." (*Id.* at 13.) In this regard, Williams alleges in his Complaint that Monroe County "through its duly elected District Attorney, had knowledge or should have had knowledge that Plaintiff was protected by a promise of immunity and could not be prosecuted as a consequence of statements he made in the April, 1991 proffer meeting and that Defendants Sartori and Checchia had a personal *animus* against Plaintiff." (Complaint, ¶ 64.) Williams further asserts:

> Defendant County of Monroe, *acting through its duly elected District Attorney,* directly or indirectly and under color of law, *approved or ratified* the unlawful, deliberate, malicious, reckless, and wanton conduct of Defendants Sartori, Checchia and/or Kelly and assistant prosecutors, in their dealings with Plaintiff including but not limited to the institution of criminal proceedings against Plaintiff, the unlawful retaliation against him for the exercise of his right of association and petition for redress of grievances, the attempt to pressure Plaintiff into giving information against John A. Pansy he did not have, and the denial of Plaintiff's Fourth and Fifth Amendment rights.... [*Id.,* ¶ 66; emphasis added.]

With respect to this liability by attribution theory, Williams, in his Brief in Opposition to Monroe County's Summary Judgment Motion, argues:

> District Attorney Gregor made the following direct decisions which render the County liable if he is considered a County officer:
>
> a. He approved the criminal complaint against Williams and decided to prosecute Williams despite the non-prosecution agreement and the failure to advise the District Justice of the existence of the agreement; and
>
> b. He decided to use "pocket immunity" as opposed to Pennsylvania's statutory immunity and thereafter used involuntary statements in adversary hearings against Williams.

c. He pursued a retaliatory prosecution against Williams simply because his performance on the stand did not meet expectations.

(Brf. in Opp. to Monroe Cty. S.J. Mot. at 17.)

Williams' second theory of liability is based upon the District Attorney's failure "to supervise and/or train employees and police officers whose supervision he assumed." (*Id.*) According to Williams, liability should be imposed upon the County because:

> The County of Monroe, *acting through the District Attorney's Office, failed to supervise and/or train members of the District Attorney's Office and investigators* concerning witness immunity, the distinction between statutory and "pocket" immunity, the effect of "pocket" immunity, what was necessary to be in a criminal complaint affidavit, and conduct before the Grand Jury. The record also demonstrates a failure to supervise an assistant district attorney who was also a member of the Borough of Stroudsburg Police Civil Service Commission concerning a prosecutor's duty not to use the criminal process to force John Pansy from the police department. [Brf. in Opp. to Monroe Cty. S.J. Mot. at 22; emphasis added.]

### 1. County Liability for Prosecutorial Decisions

Williams has not sued the District Attorney and concedes that Gregor, in his individual capacity, would be absolutely immune from liability for his decision to prosecute Williams. (Brief in Opp. to Monroe Cty. S.J. Mot. at 14 n. 3.) Asserting that Monroe County cannot claim the absolute immunity that is a personal to a prosecutor, *see Owen v. City of Independence,* 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), Williams insists that the decision of the District Attorney to prosecute him is an official "edict or act" of a county policymaker that is properly attributed to Monroe County under *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and its progeny.

Under *Monell,* "[a] public entity such as [Monroe] County may be held liable for the violation of a Constitutional right under 42 U.S.C. § 1983 only when the alleged unconstitutional action executes or implements policy or a decision officially adopted or promulgated by those whose acts may fairly be said to represent official policy." *Reitz v. County of Bucks,* 125 F.3d 139, 144 (3d Cir.1997). Alternatively, "in the absence of an unconstitutional policy, a municipality's failure to properly train its employees and officers can create an actionable violation of a party's constitutional rights under § 1983 ... where the failure to train amounts to deliberate indifference to the rights of persons with whom the [municipal employees] come into contact.'" *Id.* at 145.

The essential premise of Williams' first liability theory is that a District Attorney acts as a county policymaker when making prosecutorial decisions. Thus, the threshold question on Williams' first liability theory is whether the District Attorney's *prosecutorial* decisions represent official County policy.

Both Monroe County and Williams have addressed this question in the context of Eleventh Amendment immunity analysis. But whether a particular official acts as a county or state policymaker for purposes of municipal liability is analytical distinct from the question of whether a particular person is entitled to claim the state's Eleventh Amendment immunity. *See Hudson v. City of New Orleans,* 174 F.3d 677, 682 n. 1 (5th Cir.1999). The appropriate analytical framework is not that which applies to Eleventh Amendment immunity matters, but instead is that which was established in *McMillian v. Monroe County,* 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997).

After his murder conviction had been overturned, McMillian brought a civil rights action, charging, *inter alia,* the

Sheriff of Monroe County, Alabama with intimidating a witness into making false statements and suppressing exculpatory evidence. Because the County Sheriff had been sued only in his official capacity, the dispositive question was whether the Sheriff's law enforcement decisions could constitute official county policy. *Id.* at 783, 117 S.Ct. 1734. As Chief Justice Rehnquist explained, "[a] court's task is to 'identify those officials of [governmental] bodies who speak with final policy making authority for the local governmental actor *concerning the action alleged to have caused the particular constitutional or statutory violation at issue.'*" [*Id.* at 784–85, 117 S.Ct. 1734; emphasis added.] The Court directed that this inquiry be guided by two principles: first, the focus must be on the particular action or decision that is being assailed. The second guiding point is that state law pertaining to the characterization of the decision or action at issue is controlling. The Court recognized, however, that " 'state law will [not] always speak with perfect clarity,' " and that " '[i]t may not be possible to draw an elegant line that will resolve this conundrum.' " *Id.* at 793, 117 S.Ct. 1734.

In *McMillian,* certain factors weighed in favor of a determination that the Sheriff acted as a county policy maker. In particular, the fact that he was paid by the county, his equipment, supplies, and reimbursement for expenses was provided by the county, his jurisdiction was limited to the borders of the county, and he was elected by the voters in his county all "cut in favor of the conclusion that sheriffs are county officials." *Id.* at 791, 117 S.Ct. 1734. But these factors were outweighed by (a) Alabama constitutional provisions that indicated that the sheriff for each county was part of the state's executive department; (b) Alabama Supreme Court pronouncements that county sheriffs are state officers when acting in their law enforcement capacity; and (c) Alabama statutory provisions that indicated that county sheriffs represented the state in law enforcement activities. In this regard, the Court found that, *"most importantly,"* Ala-

bama law imposed upon sheriffs "the duty ... to ferret out crime, to apprehend and arrest criminals and, insofar as within their power, to secure evidence of crimes in their counties and to present a report of the evidence so secured to the district attorney or assistant district attorney for the county." *Id.* at 790, 117 S.Ct. 1734 (emphasis added.) The Court observed that Alabama sheriffs were thus "given complete authority to enforce the state criminal law in their counties." *Id.* The counties themselves, by way of contrast, did not have any law enforcement authority. Accordingly, the governing body of the counties, the county commission, could not instruct the sheriff with respect to law enforcement activities. The Court thus concluded that, although the evidence was conflicting, "Alabama sheriffs, when executing their law enforcement duties, represent the State of Alabama, not their counties." *Id.* at 793, 117 S.Ct. 1734.

■ Application of the *McMillian* analysis to the circumstances of this case compels the conclusion that District Attorney Gregor's prosecutorial decisions were made in his capacity as a representative of the Commonwealth of Pennsylvania, and not of the County of Monroe. As in the case of *McMillian,* there is some evidence that suggests that a District Attorney in Pennsylvania is a county officer. For example, the state constitution denominates a district attorney as a county officer. *See* Pa. Const., Article IX, section 4. ("County officers shall consist of ... district attorneys ... and such others as may from time to time be provided by law.") Moreover, expenses incurred by a district attorney in the investigation of crimes are paid by the county from its general funds. 16 P.S. § 1403. County commissioners, the governing body of Pennsylvania counties, have the authority to decide whether a district attorney should be full time. *See* 16 P.S. § 1401(g). The county salary board, furthermore, determines the salary of assistant district attorneys and county detectives. *See* 16 P.S. §§ 1420 and 1440.

Like Alabama, however, there is conflicting evidence as to the capacity in which a county district attorney acts when enforcing Pennsylvania penal law. For example, state law, and not the county commissioners, sets the salary for district attorneys. 16 P.S. § 1401(g). And it is state law that governs the filling of a vacancy in the D.A.'s Office. 16 P.S. § 1404. Perhaps most importantly, Pennsylvania law does not confer upon the county's governing body, the county commissioners, law enforcement authority. Nor does it impose upon the county commissioners the authority to direct the district attorney's prosecutorial decisions. On the contrary, state law makes clear that the district attorney is to "conduct in court all criminal and other prosecutions, *in the name of the Commonwealth....*" 16 P.S. § 1402(a) (emphasis added.) Indeed, district attorneys are directed by statute to "perform all the duties which [had been] performed by [state] deputy attorneys general...." *Id.*[12] The Pennsylvania Supreme Court has remarked that "[i]f this statute means anything at all, it means that *district attorneys in this Commonwealth have the power—and the duty—to represent the Commonwealth's interests in the enforcement of its criminal laws.*" *Commonwealth. ex. rel. Specter v. Bauer,* 437 Pa. 37, 41, 261 A.2d 573, 575 (1970) (emphasis added.) The Pennsylvania Supreme Court has also remarked this district attorneys and Commonwealth attorneys are the only public officials "charged with the legal responsibility of conducting 'in court, all criminal and other prosecutions in the name of the Commonwealth.'" *Id.* at 43, 261 A.2d at 576. Moreover, only the Attorney General, and not the county commissioners, may supersede a district attorney in connection with prosecutorial decisions. *See* 71 P.S. § 732–205(a)(4). It

is the Attorney General of the Commonwealth of Pennsylvania, and not a county officer, who may refer to the district attorney alleged violations of the criminal laws of Pennsylvania for prosecution. *See* 71 P.S. § 732–205(b).

As in *McMillian,* there is some evidence in this case to support the proposition that a Pennsylvania district attorney is a county policy maker when engaged in his law enforcement capacity. Indeed, the constitutional designation of the Pennsylvania district attorney as a county officer is a factor not present in *McMillian* that supports Williams' position. But that factor does not tip the scales in Williams' favor. The historical foundation for the office of district attorney—serving as a replacement for state deputy attorneys' general, with the obligation to perform the duties that had been performed by those deputy attorney's general—coupled with the district attorneys' subordinate relationship to the state's chief law enforcement officer, the Attorney General, compel the conclusion that when engaged in his or her "basic function—enforcement of the Commonwealth's penal statutes," *Bauer,* 437 Pa. at 40, 261 A.2d at 575, a district attorney in Pennsylvania represents the interests of the Commonwealth and not the County.

Prosecutorial decisions necessarily encompass the approval of a criminal complaint, the decision to enter into an immunity agreement with a witness, and a decision to prosecute based upon inconsistencies between statements made during a law enforcement interview and grand jury testimony. Thus, Williams' first theory of liability against Monroe County must fail because its major premise—that District Attorney Gregor acts as a county

---

12. As explained in *Commonwealth ex rel. Specter v. Freed,* 424 Pa. 508, 512, 228 A.2d 382, 383–84 (1967):

> Prior to 1850, investigation and prosecution of crime in Pennsylvania were exclusively the duty of the Attorney General, a Commonwealth official. In practice, that official discharged the duties imposed on him

> by the appointment of deputy attorneys general empowered to act as his agents within the several counties. In 1850 the General Assembly enacted legislation transferring the duties performed by such appointed deputy attorneys general to an official elected by the voters of the county and designated 'district attorney.'

policymaker when acting in his prosecutorial capacity—is without merit.

The Third Circuits' recent decision in *Carter v. City of Philadelphia,* No. 98–1581, 181 F.3d 339 (3d Cir.1999), which held that district attorneys' cannot claim Eleventh Amendment immunity for their administrative decisions, supports the results reached here. In *Carter,* the plaintiff sued individuals in the Philadelphia D.A.'s Office based upon their alleged "failure as administrators to establish training, supervision and discipline policies which would have (a) prevented or discouraged Philadelphia police officers from procuring perjurious 'eye witnesses' and (b) alerted assistant district attorneys to the falsity of such information and prevented its introduction as evidence." *Id.* at 343. As framed by the Third Circuit, the dispositive issue as to the claims against the D.A.'s Office was "whether Pennsylvania's Eleventh Amendment immunity extends to Philadelphia district attorneys for claims arising from administrative and policy making—rather than prosecutorial—functions." *Id.* at 341–42. As thus framed, the court's inquiry was directed by the factors pertinent to a determination of Eleventh Amendment immunity:

"(1) the source of funding—i.e., whether payment of any judgment would come from the state's treasury, (2) the status of the agency/individual under state law, and (3) the degree of autonomy from state regulation." *Id.* at 347. The Third Circuit did not engage in the function—specific analysis mandated by *McMillian* when the question is whether a defendant acts in a state or local policy making capacity. Furthermore, the Third Circuit was careful to distinguish between a district attorney's prosecutorial and administrative functions. Indeed, the Third Circuit characterized a district attorney's *"core state function"* as "prosecution." *Id.* at 351 (emphasis added.) In this respect, our Court of Appeals embraced the approach of other circuit courts, which have "repeatedly differentiated between administrative and prosecutorial functions, generally finding the former to be local and the latter to be state."

*Id.* After canvassing some of the pertinent case law from other circuits, Judge Mansmann in *Carter* concluded:

The recurring theme that emerges from these cases is that county or municipal law enforcement officials may be State Officials when they prosecute crimes or otherwise carry out policies established by the State, but serve as local policymakers when they manage or administer their own offices. Indeed, we ourselves concluded in *Coleman v. Kaye* 87 F.3d 1491, 1499 (3d Cir.1996), [*cert. denied,* 519 U.S. 1084, 117 S.Ct. 754, 136 L.Ed.2d 691 (1997) ] that county prosecutors can have 'a duel or hybrid status.' When 'enforcing their sworn duties to enforce the law . . ., they act as agents of the State [but] when county prosecutors are called upon to perform administrative tasks unrelated to their strictly prosecutorial functions . . . the county prosecutor in effect acts on behalf of the county that is the situs of his or her office.' *Id.* at 352–53.

Finding that the complaint in *Carter* concerned administrative, not prosecutorial, functions, the Third Circuit declined to dismiss it.

Here, by way of contrast, Williams seeks to impose liability on Monroe County specifically for "prosecutorial decisions." (Brf. in Opp. to Monroe City Mot.S.J. at 14.) The analysis in *Carter* supports the conclusion that the County cannot be held liable on the basis of the challenged "prosecutorial decisions."

As suggested in *Carter,* the result reached here is consistent with the approach taken by other Courts of Appeals. For example, in *Baez v. Hennessy,* 853 F.2d 73 (2d Cir.1988), *cert. denied,* 488 U.S. 1014, 109 S.Ct. 805, 102 L.Ed.2d 796 (1989), an action was brought against the District Attorney for Onondaga County, New York and Onondaga County for malicious prosecution. After finding that the District Attorney was entitled to absolute immunity for his clearly prosecutorial acts, the court addressed the issue of the Coun-

ty's liability. The court held that under New York law, the prosecutorial acts of a district attorney "may not 'fairly be said to represent official policy' of the County." *Id.* at 76. In language particularly apropos here, the Second Circuit explained:

It is well established in New York that the district attorney, and the district attorney alone, should decide when and in what manner to prosecute a suspected offender.... The State of New York reserves the right to fill vacancies and establish minimum salaries so as to insure that district attorneys' will be freely independent to act in this impartial manner.[13] No county policy can require them to act otherwise.

[A]n elected district attorney's powers and duties in connection with the prosecution of a criminal proceeding are the same as those of an Assistant Attorney General appointed to handle such a prosecution.[14] A county has no right to establish a policy concerning how either official should prosecute violations of State penal laws. Indeed, it would be a violation of a district attorney's ethical obligations as counsel for the State in a criminal proceeding to permit himself to be influenced in the performance of his duties by so-called policies of a county.... Where, as here, controlling law

places limits on the County's authority over the District Attorney, the County cannot be said to be responsible for the conduct at issue. *Id.* at 77.

In *Esteves v. Brock,* 106 F.3d 674 (5th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 91, 139 L.Ed.2d 47 (1997), plaintiff sought damages from Harris County, Texas and an Assistant District Attorney for her use of peremptory challenges to exclude African Americans from a criminal trial jury. Plaintiff alleged a policy of the Harris County D.A. to exercise peremptory challenges to remove African Americans from criminal jury panels. In holding that Harris County could not be held liable, Chief Judge Politz wrote:

"Assuming for the purposes of the Fed. R.Civ.P. 12(b)(6) motion that the allegation of a widespread practice of discrimination is true, in exercising peremptory challenges the Harris County District Attorney [was] acting not as [a] county officer but as [an] advocate for the state, prosecuting violations of Texas criminal law. The alleged discriminatory practices are not fairly attributable to Harris County because they are actions taken by agents of the state as part of the prosecutorial function." *Id.* at 677.[15]

---

**13.** In Pennsylvania, state law determines the procedure for filling a vacant district attorney's office and establishes salaries of district attorneys. 16 P.S. §§ 1401(g) and 1404.

**14.** Similarly, in Pennsylvania both a district attorney and a deputy attorney general have the same powers and duties in connection with certain criminal prosecutions. *See* 71 P.S. § 732–205(b) and (d).

**15.** In reaching this result, the Fifth Circuit distinguished its earlier decision in *Crane v. Texas,* 766 F.2d 193 (5th Cir.), *cert. denied,* 474 U.S. 1020, 106 S.Ct. 570, 88 L.Ed.2d 555 (1985), a case on which Williams relies. As did our Court of Appeals in *Carter* and as other Courts of Appeals have, the Fifth Circuit in *Esteves* recognized that a line must be drawn between a district attorney's prosecutorial and administrative functions, with the county bearing potential liability for the latter, but not the former. *Esteves,* 106 F.3d at

678; *see also Pusey v. City of Youngstown,* 11 F.3d 652, 657 (6th Cir.1993) (prosecutor, although local official, acts as state agent when enforcing state law), *cert. denied,* 512 U.S. 1237, 114 S.Ct. 2742, 129 L.Ed.2d 862 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 536 (2d Cir.1993) (prosecutorial decisions made by a district attorney cannot give rise to municipal liability, but decisions pertaining to the administration of the district attorney's office may give rise to municipal liability); *Owens v. Fulton County,* 877 F.2d 947, 952 (11th Cir.1989) (A district attorney may simultaneously exercise county authority and state authority, with prosecutorial decisions being vested pursuant to state authority). In *Esteves,* the court concluded that "when acting in the prosecutorial capacity to enforce state penal law, a district attorney is an agent of the state, not of the county in which the criminal case happens to be prosecuted." 106 F.3d at 678. *Esteves* thus undermines Williams' reliance upon *Crane.*

In summary, the result reached here is consistent with decisions from every court of appeals to have addressed the issue, is anticipated by our Court of Appeals' analysis in *Carter,* and is compelled by the analysis mandated by the Supreme Court in *McMillian.* Accordingly, Williams' first theory of liability against Monroe County fails on the ground that District Attorney Gregor was acting in a prosecutorial capacity, and therefore, as a state officer and not as a local officer, in pursuing the charges against Williams.[16]

## 2. Liability Based Upon a Failure to Train or Supervise

■ Williams' second theory of liability against Monroe County is based upon a district attorney's administrative responsibility to train and supervise his subordinates. As noted above, it has generally been held that when the focus of the plaintiff's civil rights claims are on the administration of the district attorney's office, the district attorney is regarded as an official of the county so that the county may be held liable where the facts establish a failure to train or supervise that evidences a deliberate indifference to the rights of the plaintiff. *See, e.g., Walker v. City of New York,* 974 F.2d 293, 300 (2d Cir.1992), *cert. denied,* 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993). The Third Circuit's analysis in *Carter* supports a conclusion that a failure to train/supervise claim can be asserted against a county based upon a district attorney's management of his or her office. Accordingly, Monroe County's motion to dismiss Williams' failure to train/supervise claim was denied. In denying that motion, however, I observed that establishing the liability of a municipality based upon a failure to train was not a facile matter.

■ As explained in *Reitz,* 125 F.3d at 145:

Establishing municipal liability on a failure to train claim under § 1983 is difficult. A plaintiff pressing a § 1983 claim must identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred. Recently, the Supreme Court reiterated the difficulty of this standard, noting in the context of an inadequate background screening case that a § 1983 plaintiff must also demonstrate, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. When a plaintiff alleges that a municipality has not directly inflicted an injury, but has caused an employee to do so, stringent standards of culpability and causation must be applied to insure that the municipality in a § 1983 suit is not held liable solely for the conduct of its employee.

At this stage of the litigation, the question is whether Williams has presented sufficient evidence from which a reasonable jury could find (1) an inadequate training program or inadequate supervision, (2) deliberate indifference on the part of the district attorney in adequately training or supervising law enforcement officers, and (3) a causal nexus between the alleged inadequate training or supervision and the deprivation of some federally protected right. *See Merritt v. County of Los Angeles,* 875 F.2d 765, 770 (9th Cir.1989).

■ As to the first element—inadequate training or supervision—Williams' Brief in Opposition to Monroe County's Summary Judgment Motion makes clear that he is

---

16. In denying Monroe County's motion to dismiss, I considered only the failure to train theory of liability advanced by Williams. (*See* Memorandum and Order filed May 11, 1998 (Dkt. Entry 31).) As I noted at that time, "It seems that based on Pennsylvania law, a District Attorney is a state actor on some occasions and a county actor on others," and that whether Williams is entitled to prevail against Monroe County would "depend on whether the District Attorney function is a state or county function." *Id.* at 4. In his prosecutorial capacity, the District Attorney is clearly performing a state function.

really complaining about action of District Attorney Gregor, and not about action of those subordinates over whom Gregor had supervisory responsibility. For example, Williams observes that it was Gregor who approved the complaint and affidavit prepared by Checchia, Fedor, Sartori and members of Gregor's staff. (Brf. in Opp. to Monroe Cty.S.J. Mot at 18.) He also complains of Gregor's impermissible use of "pocket immunity" instead of the state immunity statute. (*Id.* at 19.) Williams complains about Gregor's handling of the grand jury. (*Id.* at 20–21.) By bringing Gregor's subordinates into the picture, Williams seeks to clothe the prosecutorial decisions of Gregor in administrative apparel. The bar to municipal liability when a district attorney acts in a prosecutorial capacity cannot be so easily circumvented.

Even if Williams was properly complaining of a failure to train or supervise, he has not presented sufficient evidence to support a rational conclusion that the alleged failure amounted to "deliberate indifference" to the rights of persons with whom Gregor's subordinates would come into contact. *Carter* recognized a tripartite test for establishing the deliberate indifference requirement: "it must be shown that (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." 181 F.3d 339, 1999 WL 250771, at *13. While the first element of the *Carter* test is met in that a district attorney should know that his or her subordinates will confront situations where a witness has been granted immunity from prosecution, Williams has not proffered any evidence on the second and third parts of the test.

In particular, there is no evidence that whether a perjury/false statements prosecution may be maintained in light of the existence of a non-prosecution agreement presents a difficult choice. More importantly, there is no evidence of any history of mishandling of non-prosecution agreements by the Monroe County District Attorney's Office. Williams has not presented evidence of any other case where a Monroe County prosecutor violated a non-prosecution agreement or immunity order.

In *Reitz*, the plaintiff complained about inadequate training and supervision with respect to property forfeiture proceedings. The plaintiffs, however, did not present any evidence of similar conduct occurring in the past or that the conduct in question had occurred specifically because of insufficient training and not as a result of personal animus. Under these circumstances, our Court of Appeals concluded "that the record before us is critically deficient of evidence on which a jury reasonably could have based its conclusion that Bucks County was deliberately indifferent to the need to train the prosecutors and this failure to train was the actual cause of the plaintiffs' injuries." 125 F.3d at 145.

An identical conclusion is compelled here. In the absence of evidence of past misuse of non-prosecution agreements, immunity agreements, or immunity orders, there is no basis for a finding of deliberate indifference. Moreover, it cannot be said that the risk of a denial of constitutional rights is so obvious under the circumstances presented here that a single violation will support a reasonable inference of deliberate indifference.

Finally, Williams has not shown that the failure to train or supervise actually caused the commencement of the prosecution against him. As Williams concedes, it was the district attorney who made the decisions to empanel the grand jury, to call Williams to testify before the grand jury, to cause a presentment against Williams to be made to the grand jury, and to prosecute Williams. Thus, inadequate training or supervision did not bear any causal relationship to the injuries claimed in this lawsuit.

### 3. Conclusion as to Claims Against Monroe County

In summary, state law with respect to the district attorney's basic function of en-

forcing Pennsylvania criminal law defeats Williams' first theory of liability against Monroe County, and the facts of record defeat his second theory of liability. Accordingly, Monroe County's Motion for Summary Judgment will be granted.

### C. Williams' Claims Against the Borough Defendants

Williams asserts claims against Borough Police Chief Kelly for conspiracy to violate Williams' federally protected rights (Count I), retaliation for Williams' exercise of First Amendment rights (Count II), violations of Williams' Fifth Amendment Rights (Count III), and common law tort claims for false arrest, false imprisonment, malicious prosecution, abuse of process and intentional infliction of emotional distress (Count VII). (Dkt. Entry 1.) [17] Williams also seeks recovery from the Borough for the tort claims in Count VII and for "directly or indirectly, under color of law, approv[ing] or ratify[ing] the unlawful, deliberate, malicious, reckless, and wanton conduct of" Chief Kelly (Count V). (Complaint at ¶ 70.) Because Williams has not offered any evidence that Kelly knew about the non-prosecution agreement or that Kelly had anything to do with initiating the charges against Williams, summary judgment will be granted in favor of the Borough Defendants.

### 1. Williams' Conspiracy Claims

■ The Borough Defendants contend that they should be granted summary judgment because Williams has not presented any competent evidence which would allow the imposition of liability against either Kelly or the Borough. (Br. of Kelly & Borough in Supp. of Mot'n for S.J. at 3.) In support of this position, defendants note that Kelly played no role in the decision to charge Williams and did not know of the 1991 non-prosecution agreement or District Attorney Gregor's decision to be bound by it. (*Id.*) Kelly and the Borough claim that Williams' perception

that Kelly "had it out" for Williams "because of an alleged dislike of John Pansy" is not sufficient to justify allowing Williams' suit to survive summary judgment. (*Id.*)

Williams asserts that it is unnecessary to show that Kelly participated in or urged the prosecution of Williams because the prosecution of Williams was part of a conspiracy to remove Pansy from Borough employment. As related by Williams, the "common objective [of the conspiracy] was to drive Pansy from Borough employment as a Police Officer." (*Id.* at 13.) Relying upon the general principle that a conspirator is liable for the acts of co-conspirators in furtherance of the conspiracy's objective, Williams maintains that Kelly may be found liable ·even though there is no evidence that he participated in the procurement of criminal charges against Williams.

■ Williams' reliance upon principles of co-conspirator liability is not supported by the law or the facts. First, § 1983 extends liability only to a person who, acting under color of state law, "*causes* to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws...." 42 U.S.C. § 1983 (emphasis added.) In the conspiracy context, the requirement of personal participation in the alleged wrongdoing means that there must be evidence of "(1) an actual violation of a right protected under § 1983 and (2) actions taken in concert by the defendants *with the specific intent to violate the aforementioned right.*" *Kerr v. Lyford,* 171 F.3d 330, 340 (5th Cir.1999) (emphasis added). There must be an agreement or an understanding to deprive the complaining plaintiff of his or her constitutional rights. *Kelley v. Myler,* 149 F.3d 641, 648–49 (7th Cir.1998); *Strength v. Hubert,* 854 F.2d 421, 425 (11th Cir.1988) (plaintiff must show that the defendants " 'reached an

---

**17.** Count VII is, numerically, the sixth count of the Complaint. However, because it is numbered as Count VII, it shall be referred to as such.

understanding to violate [his] rights' "). "To demonstrate a conspiracy under § 1983, a plaintiff must show that two or more conspirators reached an agreement to *deprive him or her* of a constitutional right 'under color of law.' " *Parkway Garage, Inc. v. City of Phila.*, 5 F.3d 685, 700 (3d Cir.1993). In this case, Williams has not presented any evidence of an agreement between Kelly and others to deprive Williams of any constitutional right. Contrary to Williams' unsubstantiated assertion, it is not enough to show that there was a conspiracy to "get Pansy" in which Kelly participated.

■ Second, even if it was not essential to show that Kelly reached an agreement to violate Williams' constitutional rights, Williams theory stretches the liability of co-conspirators beyond that permitted by law. "Civil conspiracy . . . renders a conspirator liable for the *foreseeable* acts of co-conspirators performed to further that conspiracy." *Watson v. Borough of Darby,* No. Civ.A. 96–7182, 1997 WL 135701, at *2 (E.D.Pa. Mar. 17, 1997). " 'Conspirators are chargeable with the acts of their fellows only if the acts are done in the furtherance of the joint venture as all understood it; they are not to be held for what some of the conspirators unknown to the rest do beyond the reasonable intendment of the common understanding.' " *Taxin v. Food Fair Stores, Inc.,* 287 F.2d 448, 451 (3d Cir.1961), *cert. denied,* 366 U.S. 930, 81 S.Ct. 1651, 6 L.Ed.2d 389 (1961).

The evidence with respect to Kelly is that he understood that Williams would provide information that would incriminate Nevill who in turn would implicate Pansy. Williams has presented no evidence that he knew that Williams' grand jury testimony differed from accounts of his 1991 interview. Williams has not presented any evidence that Kelly was aware of the existence of a non-prosecution agreement entered into in connection with the 1991 in-

terview. Kelly, on the other hand, has presented uncontradicted testimony establishing that he was unaware of any intent to violate a 1991 non-prosecution agreement.

In his deposition, Kelly testified that he had no knowledge pertaining to the 1991 charges against Williams and Nevil because he had never worked with them. (Kelly Dep. at 41.) Kelly also testified that his only function before the grand jury was to provide and authenticate documents that he was subpoenaed to produce. (*Id.*) Kelly had no knowledge of the 1991 investigations involving Nevil and Williams because those investigations occurred before he came to Stroudsburg. (*Id.* at 39.) Most importantly, Kelly testified that prior to the presentments being handed down by the grand jury and the subsequent arrest of Pansy, Nevil and Williams, he had no knowledge about whether Heath Williams had received immunity from the Commonwealth of Pennsylvania for either his 1991 interview or his grand jury testimony. (*Id.* at 54.)

Kelly's testimony is not the only source of evidence that he did not know about the Williams' matter and therefore could not have shared a conspiratorial objective to violate Williams' rights. Williams testified that Kelly was not present when he discussed the substance of his grand jury testimony with Checchia and Sartori in 1995. (Williams Dep. at 89.) Williams also testified that the only information he had that Kelly conspired with the other members of the prosecution team was a letter from Kelly to Worthington, or vice versa, that mentioned Pansy's name. (*Id.* at 90–91.)[18] Williams has no knowledge about whether that letter mentioned his name. (*Id.*) Moreover, Williams' former attorney, William Watkins, never heard from any source that Kelly was trying to persuade anyone to lodge charges against

---

18. The letter described by Williams is not a part of the record before this Court as it has not been submitted as an independent exhibit

and was not an exhibit at the deposition of Kelly.

Williams after Williams had testified before the grand jury. (Watkins Dep. at 56.)

The only circumstantial evidence that Williams can rely on is one meeting between the defendants and Kelly before the grand jury was convened. (Kelly Dep. at 36–39.) Williams does not contend that a perjury prosecution against him was within the reasonable contemplation of the parties at the time of that meeting. Thus, this meeting is not sufficient to submit to the jury Kelly's liability as one who conspired to violate Williams' rights. Accordingly, Kelly is entitled to judgment in his favor on Count I of the Complaint.[19]

### 2. Williams Other Claims against the Borough Defendants

Williams has also brought claims against Kelly for alleged violations of his First and Fifth Amendment rights (Counts II and III.) He has also asserted common law tort claims for false arrest, false imprisonment, malicious prosecution, abuse of process and intentional infliction of emotional distress against both Kelly and the Borough.

### a. The First Amendment Claim (Count II)

■ The First Amendment claim is based upon the assertion that Kelly, along with Fedor, Checchia and Sartori, were "motivated ... to retaliate against Plaintiff for his protests and threats of action against members of the Attorney General's Office for failure to comply with plaintiff's expungement order entered following his original prosecution." (Complaint, ¶ 55.) As noted above, Williams has adduced no evidence that Kelly had some involvement in the decision to prosecute him. Nor has he presented any evidence that Kelly was aware of the disposition of the 1991 charges against Williams or any problems

Williams had encountered in the implementation of the expungement order. Personal involvement in the violation of a plaintiff's constitutional rights is the *sine qua non* of § 1983 liability. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1294 (3d Cir.1997). Because Williams has not presented any evidence to suggest that Kelly helped procure Williams' prosecution to retaliate against him for the exercise of First Amendment rights, Kelly is entitled to summary judgment on Count II of the Complaint.

### b. The Fifth Amendment Claim

■ Williams also alleges that Kelly, along with Fedor, Checchia and Sartori, violated Williams Fifth Amendment rights by promising him immunity to induce his testimony and then commencing a prosecution against Williams based upon his immunized statements. (Complaint, ¶¶ 58–59.) As discussed above, the record does not support Williams' contention as to Kelly. There is no evidence that Kelly knew about the immunity agreement; in fact, there is testimony from Kelly that directly refutes this allegation. Moreover, Kelly came to the Stroudsburg Borough Police Department after Williams had been immunized by the Attorney General's Office, and there is no evidence that Kelly was ever involved in any interrogation or questioning of Williams. Accordingly, Williams' Fifth Amendment claim against Kelly must fail.

### c. The Common Law Claims[20]

■ In order to prevail on a malicious prosecution claim, the plaintiff must demonstrate that "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor;

---

**19.** Williams' claim against the Borough is premised upon Kelly's alleged participation in a conspiracy to force Pansy from Borough employment. Because this purported conspiracy cannot serve as a predicate for imposing liability on Kelly with respect to the prosecution of Williams and there is no evidence that Kelly had any participation in procuring

that prosecution, the Borough is entitled to judgment in its favor on Count V of the Complaint.

**20.** As to the common law claims, Williams seeks to hold the Borough liable on a *respondeat superior* theory.

(3) the proceeding was initiated without probable cause; and (4) the defendants acted maliciously for a purpose other than bringing the plaintiff to justice." *See Hilfirty v. Shipman*, 91 F.3d 573, 579 (3d Cir.1996). As to Kelly, Williams cannot prove the first element. The evidence in this case does not support a finding that Kelly had any role in the initiation of the charges against Williams. Kelly testified that his only function before the grand jury was to provide and authenticate documents that he was subpoenaed to produce. Accordingly, the Borough Defendants are entitled to summary judgment as to Williams' malicious prosecution claims.

Williams also alleges a false arrest claim. "An arrest is the taking of another into the custody of the actor for the actual or purported purpose of bringing the other before a court, or of otherwise securing the administration of the law." *Gagliardi v. Lynn*, 446 Pa. 144, 148, 285 A.2d 109, 111 (1971); *see also Kedra v. City of Phila.*, 454 F.Supp. 652, 671 (E.D.Pa.1978) (same). The Pennsylvania Supreme Court stated in *Gagliardi* that "one who confines another, while purporting to act by authority of law which does not in fact exist, makes a false arrest and must respond in damages for whatever civil wrongs he commits." *Gagliardi*, 446 Pa. at 149, 285 A.2d at 111. As with Williams' malicious prosecution claims, Williams has provided no evidence to support his contention that Kelly caused him to be arrested. Accordingly, Kelly cannot be liable on Williams' false imprisonment claims. Because there is no evidence that Kelly had any responsibility for causing Williams to be arrested, Kelly and the Borough will be granted summary judgment as to Williams' false arrest and false imprisonment claims.

■ Williams also alleges an abuse of process claim against Kelly and the Borough. "The elements of abuse of process are '(1) an 'abuse' or 'perversion' of process already initiated (2) with some unlawful or ulterior purpose, and (3) harm to the plaintiff as a result.'" *T.B. Proprietary Corp. v. Sposato Builders, Inc.*, No. Civ.A.

94-6745, 1996 WL 674016, at *3 (E.D.Pa. Nov. 20, 1996) (quoting *Kedra v. Nazareth Hosp.*, 868 F.Supp. 733, 738 (E.D.Pa. 1994)), aff'd mem., 135 F.3d 766 (3d Cir. 1997). As discussed *infra*, there is no evidence that the criminal process was perverted to secure an illegitimate end. Moreover, there is no evidence that Kelly participated in the prosecution of Williams. Accordingly, Kelly and the Borough of Stroudsburg will be granted summary judgment dismissing Williams' abuse of process claims.

■ Finally, Williams asserts a claim for intentional infliction of emotional distress. The Supreme Court of Pennsylvania has not officially recognized the tort of intentional infliction of emotional distress, although it has acknowledged the Restatement (Second) of Torts § 46. *Taylor v. Albert Einstein Med. Ctr.*, 723 A.2d 1027, 1038 (Pa.Super.1998) (citing *Kazatsky v. King David Memorial Park*, 515 Pa. 183, 527 A.2d 988 (1987)). In order to support such a claim, the plaintiff must allege conduct which is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. *Silver v. Mendel*, 894 F.2d 598, 606 n. 17 (3d Cir.) (quoting Restatement (Second) of Torts § 46 cmt. d), cert. denied, 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990). In other words, the conduct must be so extreme that it offends the very moral values of our society. *Id.* at 606. "Overreaching, but not abusive, tactics used in the course of everyday living will not support a claim for intentional infliction [of emotional distress]." *Bradshaw v. General Motors Corp.*, 805 F.2d 110, 114 (3d Cir.1986). Pennsylvania courts have been reserved in their assessment of what constitutes outrageous conduct. *See, e.g., Fewell v. Besner*, 444 Pa.Super. 559, 664 A.2d 577, 582 (1995) (finding no outrageous conduct when a doctor disclosed statements by his patient that she suffocated her son); *Nagy v. Bell Tel. Co. of Pa.*, 292 Pa.Super. 24, 436 A.2d 701 (1981) (finding no outrageous conduct

when a telephone company made an unauthorized disclosure of telephone numbers); *Jones v. Nissenbaum, Rudolph & Seidner,* 244 Pa.Super. 377, 368 A.2d 770 (1976) (finding no outrageous conduct where an attorney threatened a foreclosure with no legal basis to support such action). Furthermore, there must be objective medical evidence of severe emotional distress. *Bolden v. Southeastern Pa. Transp. Auth.,* 21 F.3d 29, 35 (3d Cir.1994).

In the instant case, Williams has not alleged actions by Kelly that could be interpreted as being outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency. Nor has he presented evidence of extreme emotional distress. Accordingly, Kelly and the Borough will be granted summary judgment on Williams' claims for intentional infliction of emotional distress.

### D. Williams' Claims Against the State Defendants

#### 1. *Count I*

Count I of Williams' complaint alleges that Sartori, Checchia, Fedor and Kelly conspired to deprive Williams of his "constitutional right to be free from malicious and harassing prosecutions without probable cause, false arrest and abuse of process in violation of plaintiff's rights guaranteed under the Fourth Amendment." (Complaint, ¶ 51.) Williams further complains in Count I that the commencement of the criminal prosecution against him "denied him the benefits of his Fifth Amendment right to remain silent by trickery and deceit," and amounted to a denial of due process as conscience-shocking conduct. Sartori, Checchia and Fedor have moved for summary judgment on Count I, contending that Williams cannot establish a violation of his constitutional rights as alleged in Count I and, even if he can, they are entitled to qualified immunity.

 "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, ——, 119 S.Ct. 1692, 1696, 143 L.Ed.2d 818 (1999). "A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether the right was clearly established at the time of the alleged violation.' " *Id.* 526 U.S. 603, 119 S.Ct. at 1697. "Deciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Id.* Accordingly, attention will first be focused on whether the allegations of Williams' complaint implicate a constitutional right and, if so, whether he has adduced sufficient evidence to warrant submission of the claim in question to a jury. Attention then will be directed to the qualified immunity question.

#### a. Malicious Prosecution

As a threshold matter, a constitutional predicate for a malicious prosecution claim must be alleged. In *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), the Court held that the due process clause did not provide a constitutional peg on which to hang a civil rights malicious prosecution claim. Williams asserts in his Complaint that his asserted right to be free from malicious prosecution is rooted in the Fourth Amendment.[21] Defendants have countered by contending that, because Williams was never placed in custody, Williams was not subjected to a "seizure" to trigger Fourth Amendment protection.

In *Gallo v. City of Philadelphia,* 161 F.3d 217 (3d Cir.1998), our Court of Ap-

---

**21.** In pertinent part, the Fourth Amendment provides: "The right of the people to be secure in their persons ... against unreasonable ... seizures shall not be violated."

peals held that restrictions imposed as part of a criminal prosecution do indeed amount to a "seizure" under the Fourth Amendment. In *Gallo*, the plaintiff had been required to post a $10,000 bond, attend all court hearings, report to pretrial services on a periodic basis, and was subjected to travel restrictions. While observing that the matter was a "close question," the court found that these restrictions amounted to a seizure. *Id.* at 222–25.

*Gallo* controls the question of whether Williams was "seized" within the intendment of Fourth Amendment jurisprudence. As in *Gallo*, the requirements inherent in the criminal process—that Williams submit to processing and appear in court as required—are sufficient restraints on liberty to constitute a Fourth Amendment "seizure." [22]

The fact that Williams has *alleged* a viable § 1983 claim for malicious prosecution does not mean he is entitled to a jury trial. Defendants contend that the evidence does not support a triable issue on malicious prosecution.

Our Court of Appeals appears to continue to adhere to the common law four part test for analyzing a § 1983 malicious prosecution claim. *See Hilfirty v. Shipman*, 91 F.3d 573, 574 (3d Cir.1996). As noted above, the four factors that plaintiff must prove are:

(1) a criminal proceeding was instituted by the defendant;

(2) probable cause to institute the proceeding was lacking;

(3) plaintiff prevailed in the criminal proceeding; and

(4) the defendants acted maliciously or for purposes other than bringing the plaintiff to justice. *Id.*

Viewed in the light most favorable to Williams, there is at least a triable issue as to whether Fedor, Checchia and Sartori were responsible for instituting criminal proceedings against Williams.[23] In addition, it is clear that Williams prevailed in the criminal proceeding. Thus, elements one and three are clearly satisfied.

Defendants maintain that there was probable cause for the prosecution, pointing to the grand jury presentment. (Brief in Support of Checchia, et al. S.J.Mot. (Dkt. Entry 44) at 12.) Williams counters by asserting that the grand jury was not informed of the non-prosecution agreement.

■ Williams' argument ignores the fact that both the grand jury presentment and the criminal complaint were sought and approved by District Attorney Gregor. Under Pennsylvania law, which provides the source for § 1983 malicious prosecution claims in this jurisdiction, "[c]riminal proceedings initiated upon advice of counsel are conclusively presumed to be supported by probable cause when the advice of counsel was sought in good faith and the advice was given after full disclosure of the facts to the attorney." *Kelley v. General Teamsters, Chauffeurs, & Helpers, Local Union 249*, 518 Pa. 517, 521, 544 A.2d 940, 942 (1988); *accord Strickland v. University of Scranton*, 700 A.2d 979, 984 (Pa.Super.1997).[24] The Third Circuit has recog-

---

**22.** In *Torres v. McLaughlin*, 163 F.3d 169 (3d Cir.1998), our Court of Appeals ruled that a malicious prosecution claim "may be based on a constitutional provision other than the Fourth Amendment," except that it "may not be grounded in substantive due process." *Id.* at 172. As noted above, Williams premises his malicious prosecution claim on the Fourth Amendment. (*See* Complaint, ¶ 51(d).) He also claims, however, that the institution of the criminal action violated his Fifth Amendment rights. This claim will be considered separately.

**23.** Sartori did not sign the criminal complaint and affidavit of probable cause. He was, however, involved with the investigation and it cannot be said that he did not participate in the procurement of charges against Williams.

**24.** Pennsylvania's statutory codification of the tort of malicious prosecution provides that liability may not be imposed where the defendant, after full disclosure of all pertinent facts, has relied in good faith on the advice of counsel. 42 Pa.C.S.A. § 8352.

nized the significance of advice of counsel in establishing probable cause in the context of a malicious prosecution action. *See Lee v. Mihalich*, 847 F.2d 66, 72 (3d Cir. 1988). The attorney's advice need not be correct. *American Int'l Airways, Inc. v. American Int'l Group, Inc.*, 816 F.Supp. 1058, 1064 (E.D.Pa.1993) (no requirement under Pennsylvania's statutory codification of malicious prosecution action that counsel's advice be sound where it is relied upon as defense to liability).

■ In this case, it is undisputed that District Attorney Gregor was aware of the 1991 letter agreement of Deputy Attorney General Burfete. Indeed, he had agreed to be bound by it. District Attorney Gregor approved the presentment and criminal complaint, which did not disclose the existence of the 1991 letter agreement. Williams has not suggested any reason why it would have been unreasonable for Checchia, Fedor or Sartori to rely upon the advice of counsel. In this regard, he has not contended that the moving defendants should have been aware of some personal bias on the part of Gregor to prosecute Williams. Nor does Williams contend that any of the moving defendants fabricated information that was supplied to Gregor. In particular, Williams has not presented any evidence that would suggest that Fedor, Checchia or Sartori had reason to believe that Trooper Kresge's reports of the 1991 interview of Williams were inaccurate. Indeed, Williams does not contend that the discrepancies between the grand jury testimony and the 1991 interview reports fail to establish probable cause for the charges in the criminal complaint. Instead, he relies totally upon the existence of the non-prosecution agreement. In light of the advice of counsel that the criminal prosecution could be maintained, probable cause for the prosecution has been established. Accordingly, Fedor, Checchia and Sartori are entitled to summary judgment on the malicious prosecution claim.

■ Even if there was a triable issue on the question of probable cause to insti-

tute the criminal proceedings, Checchia, Fedor and Sartori are entitled to qualified immunity because the law regarding malicious prosecution was unsettled at the time the proceedings against Williams were brought. In *Wilson*, the Court recently reiterated that in order for a constitutional right to be "clearly established" for purposes of qualified immunity, " '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " 526 U.S. at ――, 119 S.Ct. at 1699. The Court further explained that "[t]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Id.* 526 U.S. 603, 119 S.Ct. at 1700. "Where a defendant asserts a qualified immunity defense in a motion for summary judgment, the plaintiff bears the initial burden of showing that the defendant's conduct violated some clearly established statutory or constitutional right." *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir.1997).

In *Wilson*, the Court found that the conduct of law enforcement officers in bringing members of the media into a private home to observe and record an attempted execution of an arrest warrant violated the homeowners' Fourth Amendment rights. *Id.* 526 U.S. 603, 119 S.Ct. at 1697–99. The Court further held, however, that the law enforcement officers were entitled to qualified immunity. In reaching this result, the Court observed that there were no published judicial opinions making the practice unlawful at the time in question. The Court also found it significant that the law enforcement officers had relied upon a Marshal's Service policy that explicitly contemplated that media might enter private homes with law enforcement officers. The Court observed that in light of the absence of clearly controlling case authority "it was not unreasonable for law enforcement officers to look to and rely on their formal ride-along policies." In concluding that qualified immunity was warranted, the Court explained:

Given such an undeveloped state of the law, the officers in this case cannot have been 'expected to predict the future course of constitutional law.' Between the time of the events of this case and today's decision, a split among the Federal Circuits in fact developed on the question whether media ride-alongs that enter homes subject the police to money damages. If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.

*Id.* 526 U.S. 603, 119 S.Ct. at 1701.

Prior to the Supreme Court's decision in *Albright* in 1994, the existence of a § 1983 malicious prosecution cause of action was well-established in this jurisdiction. *See Gallo,* 161 F.3d at 220 n. 4 (denying qualified immunity for conduct occurring prior to 1994 "because the pre-*Albright* law of this circuit clearly provided that malicious prosecution violated federal law"). *Albright,* however, shook the foundation of § 1983 malicious prosecution claims in this Circuit by holding that such a claim could not be based upon substantive due process.[25] Furthermore, although stating that in the past it had "noted the Fourth Amendment's relevance to the deprivations of liberty that go hand in hand with criminal prosecutions," the Court expressed "no view as to whether [a malicious prosecution] claim would succeed under the Fourth Amendment." *Albright,* 510 U.S. at 273–74, 114 S.Ct. 807.

As noted by our Court of Appeals in its November, 1998 decision in *Gallo, Albright* "created great uncertainty in the law" with respect to the viability of a § 1983 malicious prosecution claim. 161 F.3d at 222. The court in *Gallo* further observed that "*Albright* places into doubt [the] conclusion that alleging the common law elements of malicious prosecution is enough to show a constitutional violation under § 1983...." *Id.* at 223–24. As noted above, it was not until *Gallo* that there was

a binding precedent in this jurisdiction that a § 1983 malicious prosecution claim could be maintained in the wake of *Albright* where the plaintiff had not been placed in custody. Thus, between the *Albright* decision on January 24, 1994 and the *Gallo* decision on November 23, 1998, the existence of a § 1983 malicious prosecution claim in this Circuit under the circumstances presented here was not clear. During this time frame, other courts of appeals were struggling with the implications of *Albright. See, e.g., Taylor v. Meacham,* 82 F.3d 1556, 1561 n. 5 (10th Cir.) ("*Albright* muddied the waters rather than clarified them"), *cert. denied,* 519 U.S. 871, 117 S.Ct. 186, 136 L.Ed.2d 125 (1996); *Reed v. City of Chicago,* 77 F.3d 1049, 1053 (7th Cir.1996) (referring to the "*Albright* minefield").

Given the uncertain state of the law in light of *Albright,* the defendants in this case could not have been " 'expected to predict the future course of constitutional law.' " *Wilson,* 526 U.S. at ——, 119 S.Ct. at 1701. Just as it was found to have been unfair to subject police to money damages in *Wilson* "for picking the losing side of the controversy," so too would it be unfair here to impose liability on Checchia, Fedor and Sartori at a time when the contours of the right in question were not plainly defined.

In *Brooks v. Carrion,* No. Civ. A. 96–1172, 1996 WL 563897 (E.D.Pa. Sept. 26, 1996), Judge Bartle addressed a factual scenario similar to that presented here. In *Brooks,* the alleged malicious prosecution was commenced after the *Albright* decision. After surveying the post-*Albright* law on malicious prosecution claims, Judge Bartle found that during the time period in question "there was uncertainty in the Third Circuit as to the viability of a § 1983 malicious prosecution claim...." Because the constitutional right in question was thus not "clearly established,"

---

**25.** Prior to *Albright,* our Court of Appeals had held that malicious prosecution was action-

able under § 1983 as a denial of substantive due process. *Gallo,* 161 F.3d at 221.

qualified immunity to the law enforcement officers was granted.

Williams has not cited any authority that holds that the contours of a right to be free from a malicious prosecution were plainly established during the time period in question. As in *Brooks*, the uncertainty in the law compels granting qualified immunity. Accordingly, defendants Sartori, Checchia and Fedor are entitled to summary judgment on the malicious prosecution claim on the grounds of qualified immunity.

**b. Abuse of Process**

■■■■■ "[A] section 1983 claim for malicious abuse of process lies where 'prosecution is initiated legitimately and thereafter is used for a purpose other than that intended by the law.'" *Rose v. Bartle*, 871 F.2d 331, 350 n. 17 (3d Cir.1989) (*quoting Jennings v. Shuman*, 567 F.2d 1213, 1217 (3d Cir.1977)). "The touchstone of the [abuse of process] action is a perversion of the process for a purpose for which it was not intended." *Feldman v. Trust Co. Bank*, No. Civ. A. 93–1260, 1993 WL 300136, at *4 (E.D.Pa. Aug. 2, 1993). "When process is used to effect an extortionate demand, or to cause the surrender of a legal right, or is used in any other way not so intended by proper use of the process, a cause of action for abuse of process can be maintained." *Brown v. Johnston*, 675 F.Supp. 287, 290 (W.D.Pa.1987). "Examples of actions that are recoverable under the abuse of process tort are extortion by means of attachment, execution or garnishment, and blackmail by means of arrest or criminal prosecution." *Barakat v. Delaware County Mem'l Hosp.*, No. Civ.

A. 97–2012, 1997 WL 381607, at *2 (E.D.Pa. July 2, 1997). To establish a claim for abuse of process, there must be some proof of a "definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process...." *Feldman*, 1993 WL 300136, at *4.

■■■ In his brief in opposition to the motion for summary judgment filed on behalf of Checchia, et al., Williams summarily asserts that "count I includes a claim for abuse of process since, as Judge O'Brien found, Williams was prosecuted because his grand jury testimony failed to meet expectations." (Dkt. Entry 48 at 13.) Plainly, this assertion does not evidence a perversion of the criminal process for a purpose for which it was not intended. Plainly, perjury and false statement prosecutions are based upon the fact that testimony fails to meet expectations—that it be truthful. This is especially the case where an immunized witness is testifying. Moreover, Williams' assertion deals with the initiation of the process, and not its perversion. Accordingly, Checchia, Fedor and Sartori are entitled to summary judgment on the abuse of process claim.[26]

**c. False Arrest**

■■■ Assuming that the restrictions on Williams' liberty incident to the pending criminal process is sufficient to constitute an "arrest" for purposes of a § 1983 false arrest claim, Williams must demonstrate that the law enforcement officers lack probable cause for the initiation of the prosecution. *See Groman v. Township of Manalapan*, 47 F.3d 628, 634 (3d Cir.

---

**26.** In addressing his abuse of process claim in his brief in opposition to the summary judgment motion, Williams does not advance the position that the criminal process was abused for purposes of driving Pansy out of employment. Such a claim, in any event, would be unsupported. He has not proffered any evidence of some definite act or threat directed at Williams or at an objective that was not legitimate in the use of criminal process. In this regard, it is not uncommon for prosecutors to offer lenient treatment to one under charges in order to provide incriminating information against another. Plainly, using the fact of a pending prosecution to pressure a party to provide evidence incriminating another person is not a perversion of the process. In any event, Williams has not presented any evidence that after the criminal complaint against him was filed there were any efforts to pressure him to incriminate Nevill, who in turn would incriminate Pansy.

1995). " 'The proper inquiry in a section 1983 claim based on false arrest ... is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense.' " *Id.*

■ As noted above, criminal process in this case was initiated at the direction and with the approval of District Attorney Gregor. He was acquainted with all requisite facts. Probable cause for the arrest is therefore established. The fact that Gregor misperceived the import of Deputy Attorney General Burfete's agreement does not alter the result. *See Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir.1995) (fact that law enforcement officer reasonably but mistakenly concludes that probable cause to make an arrest exists does not subject the law enforcement officer to personal liability).

■ Indeed, even if the arrest was not supported by probable cause, Checchia, Fedor and Sartori are entitled to qualified immunity. In the Fourth Amendment arrest context, an officer is " 'entitled to qualified immunity as a matter of law if the undisputed facts and all permissible inferences favorable to the plaintiff show either (a) that it was objectively reasonable for the officers to believe that probable cause existed, or (b) that officers of reasonable competence could disagree on whether the probable cause test was met.' " *Bordeaux v. Lynch*, 958 F.Supp. 77, 87 (N.D.N.Y.1997). In this case, it was objectively reasonable for the law enforcement officers to believe that probable cause existed in light of the advice of the District Attorney. At a minimum, officers of reasonable competence could disagree on whether probable cause existed given the advice of District Attorney Gregor. In this regard, Deputy Attorney General Burfete's March 20, 1991 letter agreement with Williams expressly provided that in the event that Williams was a witness "at any trial or *other legal proceeding relating to this matter* and offers testimony materially different from any statements made or other information provided during the 'off-the-record' proffer, the attorney for the Commonwealth may cross-examine your client and introduce rebuttal evidence concerning any statements made or other information provided during the 'off-the-record' proffer or discussion." Thus, the letter agreement itself contemplated use of the off-the-record proffer at a grand jury proceeding. The letter agreement explained that such a provision was necessary to assure that Williams did "not commit perjury when testifying at trial." From these provisions, it could reasonably be concluded that a perjury prosecution based upon inconsistencies between the off-the-record proffer and sworn grand jury testimony was not necessarily precluded. Accordingly, Checchia, Sartori and Fedor are entitled to summary judgment on the false arrest claim.

## 2. Count II

In Count II of his Complaint, Williams alleges that his First Amendment rights were violated because defendants initiated his prosecution in retaliation for his "protests and threats of action against members of the Attorney General's Office for their failure to comply with Plaintiff's expungement order following his initial prosecution." (Complaint, ¶ 55.) In moving for summary judgment, Checchia, Sartori and Fedor point out that "none of the moving defendants had responsibility for the expungement of Williams' records, knew whether or not they had been expunged or knew anything about [Williams'] efforts to have them expunged." (Brf. in Support of Checchia, et al. S.J.Mot. at 20.) Williams does not dispute this assertion. Instead, he contends in his opposition brief that he "could not be arrested in retaliation for his performance on the [grand jury witness] stand." (Brf. in Opp. to Checchia, et al. S.J.Mot. at 18.) He also asserts that there is a jury question on his retaliation claim because his attorney had contacted the Attorney General's Office about the expunged order and the possibility of legal action.

■ In analyzing a First Amendment retaliation claim, the Supreme Court has stated, "proof of an improper motive is not sufficient to establish a constitutional violation—there must also be evidence of causation. Accordingly, when a public employee shows that protected speech was a 'motivating factor' ... the employer still prevails by showing that it would have reached the same decision in the absence of the protected conduct." *Crawford–El v. Britton*, 523 U.S. 574, 118 S.Ct. 1584, 1594, 140 L.Ed.2d 759 (1998) (*citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

■ In the instant case, Williams has not proffered any evidence that his threats caused the State Defendants to initiate his prosecution. There is no evidence that they had any control over the expungement of Williams' records. Moreover, there is no evidence that the State Defendants were even aware of problems with implementing the expungement order. Contrary to Williams' assertion, the fact that Williams' lawyer may have complained to the Attorney General's Office is not enough to support a reasonable inference that the moving defendants were motivated to retaliate against Williams, especially since they had nothing to do with that order. Summary judgment cannot be avoided by speculation and conjecture. *Fogarty v. Boles*, 121 F.3d 886, 890 (3d Cir.1997); *Sterling Nat'l Mortgage Co. v. Mortgage Corner, Inc.*, 97 F.3d 39, 45 (3d Cir.1996).

Moreover, there is evidence that the State Defendants would have reached the same result—that Williams should be prosecuted for perjury—regardless of whether Williams had threatened action against the Attorney General's Office. District Attorney Gregor directed that the presentment against Williams be prepared. (Checchia Dep., Kelly's Doc. in Supp. of Mot'n for S.J., Exhibit "B" at 34–38.) There is no evidence, other than Williams' unsupported assertions, that anything other than Williams' testimony caused Gregor to make the decision. While the history of Williams' immunity negotiations and agreements is protracted, the genesis of the decision to prosecute Williams for perjury is easily determined. Williams was called before a grand jury and gave testimony that contradicted his previous accounts. Accordingly, even if Williams had proven improper motive on the part of defendants—which he has not—the evidence supports a finding that defendants would have followed the same course of conduct, regardless of Williams' complaints. Perjured testimony—or testimony that significantly changes previously recorded versions of events—when given under oath before a grand jury, supports a prosecutor's decision to initiate a prosecution for perjury. The fact that he is prosecuted because District Attorney Gregor believed he was lying certainly does not violate William's free speech rights. There is no right to commit perjury. Accordingly, defendants Sartori, Checchia and Fedor's motion for summary judgment will be granted as it seeks to dismiss Williams' First Amendment retaliation claim.

### 3. Count III

Count III of Williams' Complaint alleges that Checchia, Fedor and Sartori violated Williams' privilege against self-incrimination. Essentially, Williams contends that incriminating statements that he made in reliance on a non-prosecution agreement were used against him in connection with his prosecution.[27]

---

**27.** Williams also seems to complain that his statements were impermissibly introduced at grand jury proceedings. While it is true that his statements were so used, it does not follow that his privilege against self-incrimination was violated. As noted above, Deputy Attorney General Burfete's letter contemplated that Williams' statements made during the 1991 interviews could be used at any "legal proceeding relating to this matter." Thus, the introduction of Williams' statements in the grand jury proceeding was consistent with the agreement that induced Williams to provide statements in 1991.

"The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides in part that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself. U.S. Const. amend V.'" *Weaver v. Brenner*, 40 F.3d 527, 534 (2d Cir.1994). It has been recognized that a violation of the privilege against self incrimination occurs at that point in time when involuntary self-incriminating statements are used against the plaintiff in a criminal proceeding, and not when the statements are actually made by the criminal defendant. *Id.* at 535–36.

It is apparent, however, that it is the person who wrongfully coerces or otherwise induces the involuntary statement who causes the violation of the privilege. In other words, while there may be no cause of action for the wrongful procurement of *unused* incriminatory statements, see *Giuffre v. Bissell*, 31 F.3d 1241, 1255 (3d Cir.1994), *it is the wrongful procurement*, and not the incriminatory statement itself, that forms the basis for liability. Thus, a police officer who promises immunity from prosecution as a ruse to induce an otherwise involuntary statement may be held liable when that statement is used against the plaintiff in a criminal proceeding.[28]

In this case, Checchia, Fedor and Sartori did not promise Williams immunity. That was done by Burfete and Gregor. Moreover, it is undisputed that it was Gregor who decided that Williams should testify before the grand jury; it was Gregor who decided to be bound by Burfete's non-prosecution agreement; and it was Gregor who decided to charge Williams, an action that Judge O'Brien found to breach the non-prosecution agreement. Williams was not induced to make incriminating statements by a promise of immunity offered by Checchia, Fedor or Sartori. He thus cannot claim that they are responsible for

any violation of his privilege against self-incrimination flowing from a breach of the non-prosecution agreement. Indeed, it would be manifestly unfair to hold these subordinate law enforcement officers liable for the District Attorney's breach of the District Attorney's own agreement.

In any event, Checchia, Fedor and Sartori are entitled to qualified immunity on the Fifth Amendment claim. " 'Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken.'" *Wilson*, 526 U.S. at ——, 119 S.CT. at 1699. "Qualified immunity protects public officials from § 1983 civil liability so long as they 'acted reasonably under settled law in the circumstances.'" *Veilleux v. Perschau*, 101 F.3d 1, 2 (1st Cir.1996) (en banc). As noted above, it is the plaintiff who bears the burden of demonstrating that the specific right in question was, under the facts of the case, "clearly established." *Sherwood*, 113 F.3d at 399.

Williams has not cited any case that involved a Fifth Amendment claim predicated on a frustrated non-prosecution agreement. Moreover, existing precedent suggests that the State Defendants are entitled to qualified immunity.

In *Giuffre*, 31 F.3d at 1256–57, our Court of Appeals held that a law enforcement officer was entitled to qualified immunity in the context of a Fifth Amendment claim even though a reasonable officer "might have recognized that the conduct could have been the basis for suppression of Giuffre's statement." *Id.* The court concluded, "because the substantive Fifth Amendment norms allegedly violated by the individual officials were not clearly established at the time

---

**28.** The cases cited by Williams—*Weaver v. Brenner*, 40 F.3d 527 (2d Cir.1994); *Giuffre v. Bissell*, 31 F.3d 1241 (3d Cir.1994); and *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir.) (en banc), *cert. denied.*, 506 U.S. 953, 113 S.Ct. 407, 121 L.Ed.2d 332 (1992)—involved claims against those who wrongfully procured the statement.

of the challenged actions, Giuffre's claims based on violation of his Fifth Amendment right must fail." *Id.* Similarly in this case, no precedent has been cited as establishing the substantive Fifth Amendment standards in the context of a non-prosecution agreement. Certainly, it was not unreasonable for the officers to believe that Williams had not been granted a license to commit perjury.

In *Veilleux,* plaintiff claimed a Fifth Amendment violation based upon a police officer's assurance that any statement made by the plaintiff could not be used against him. While the state did not prosecute Veilleux, the federal government did. In the federal court proceedings, the district court suppressed the statements made by Veilleux because " '[u]nder the totality of the circumstances, defendant's statements were involuntary—his will not to incriminate himself, exercised repeatedly during the interrogation, was overcome by *the promises made and distorted legal advice given.'* " 101 F.3d at 2 (emphasis added). The First Circuit, sitting *en banc,* held that the law enforcement officer was entitled to qualified immunity, explaining:

> It is enough to resolve this case that the circumstances are unique and the voluntariness issue is very close. Although the right against self-incrimination is itself clearly established, Perschau is nevertheless entitled to qualified immunity '[so long as his] decision was reasonable, even if mistaken.' Indeed, the Supreme Court has said that the qualified immunity defense was designed to 'provid[e] ample protection to all but the plainly incompetent or those who knowingly violate the law.'
>
> Under an objective reasonableness standard, Perschau could reasonably believe that he was not violating Veilleux' rights but offering him an attractive bargain for a legitimate purpose, namely, to protect the public against the chance that the gun would be found by a child (or perhaps by a criminal). It makes no difference that a court might later conclude that the officer was mistaken; one of the cardinal purposes of immunity is

to offer the police 'a fairly wide zone of protection in close cases.'

*Id.* at 3.

This case, too, is a close one. Williams has not cited any authority that a breach of a non-prosecution agreement rendered statements made in reliance on the non-prosecution agreement "involuntary." Moreover, Williams has not proffered any precedent to suggest that it was unreasonable for the law enforcement officers to believe that Williams could be prosecuted for perjury based upon the inconsistencies between his sworn grand jury testimony and the statements he had made in 1991. Indeed, the District Attorney acted under the assumption that Deputy Attorney General Burfete's letter did not foreclose a perjury prosecution. (Gregor Dep. at 26, 33.) Gregor testified that it was his opinion that Burfete's letter did not preclude use of statements made during the 1991 interview because it was his understanding that the consideration for the "immunity letter" was "truthful testimony." *Id.* at 26. Gregor also testified that it was *his responsibility* to decide "whether a prosecution or basis for prosecution would lie" notwithstanding the grant of immunity. (*Id.* at 33.) Burfete's letter did, in fact, contemplate use of William's statements so that Williams would "not commit perjury when testifying at trial." (Exhibit "D" to Monroe Cty.'s Stmt. of Facts.) Thus, District Attorney Gregor's view of the import of Burfete's letter does not appear to be unreasonable. Indeed, perjury prosecutions based upon immunized testimony are generally permissible. *See United States v. Apfelbaum,* 445 U.S. 115, 128, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980).

The fact that Judge O'Brien determined Gregor's view of the Burfete letter agreement to be incorrect does not make the actions of Checchia, Sartori and Fedor unreasonable. Under an objective reasonableness standard, these law enforcement officers could rely upon Gregor's advice and believe that they were not violating Williams' rights by proceeding with the

perjury prosecution. Accordingly, Checchia, Sartori and Fedor are entitled to qualified immunity on William's Fifth Amendment claims.

## III. CONCLUSION

For the foregoing reasons, defendants' summary judgment motions will be granted.